1810.

Rusk
vs
Sowerwine

may act by deputy. The endorsement being sufficient, the sole question is, whether it is proof of the execution of the bill of sale?

*Winder,* for the Appellee. It was not proved that it was the original bill of sale that was offered in evidence; not that it was necessary it should have been recorded. It purports to be a bill of sale, but there was no proof that it was one, and that it was necessary to be recorded. The certificate of the clerk is evidence from the seal of the office, and in no other way. The act of 1715, *ch.* 47, makes it necessary for the clerk to endorse the original deeds for lands, recorded by him in his office; but the act of 1729, *ch.* 8, does not make it necessary for the clerk to make such endorsements on bills of sale; and there being no such provision, the certificate cannot be received, unless under the seal of the court in the usual mode of granting exemplifications, &c. The endorsement being rejected, and not admitted as evidence, it was incumbent on the plaintiff to have proved the execution of the paper.

THE COURT dissented from the opinion of the court below. They referred to *Kennersley vs. Orpe,* 1 *Dougl.* 56, and *Peake,* 32.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.

---

## RUSK vs. SOWERWINE.

JUNE.

APPEAL from *Baltimore* County Court. Replevin for a slave. The appellant was the plaintiff below. General issue and *limitations* were pleaded.

1. The plaintiff offered evidence, that *John Bailey,* being in his life-time possessed of a negro woman named *Hannah,* and being indebted to *Daniel Dulany,* deceased, to secure the debt, on the 12th of April 1769 executed a mortgage to *Dulany* of said negro slave, and other property, which was duly acknowledged and recorded, and was offered in evidence. And to prove that the slave in controversy was a descendant from *Hannah,* the plaintiff offered as a witness to that fact, a black woman named *Minta;* and on the defendant's objecting to her, as an incompetent witness, the plaintiff offered evidence that the witness, and the late *Benjamin Bannaker,* a black man of *Baltimore* county, were born of the same parents, and that the wit-

*A free black person is an incompetent witness in a case where the parties are free white christians.*

*A witness having proved that he received a power of attorney from a person to act for her in all things relating to her estate, as well in collecting debts as in making sale of property, &c. Held, that unless the original power of attorney was produced, or proved to be lost, or that the party had issued a subpœna duces tecum, no evidence could be given of it.*

ness and *Bannaker* were always reputed to be free; and that their mother was also reputed to be free, and to be descended of free parentage, and did actually enjoy freedom. That *Bannaker* exercised in his life the rights of a free man in holding real property, in voting at elections, and being allowed and permitted to give evidence in courts of justice in cases in which free white citizens were concerned; but it did not appear that at the times *Bannaker* was so admitted as a witness, no objections were made to his competency. The Court, (*Nicholson*, Ch. J.) determined *Minta* to be an incompetent witness, the plaintiff and defendant being free white christian persons. The plaintiff excepted.

2. The plaintiff then proved, that *Dulany*, the mortgagee, above named, died in the year 1797, having by his last will and testament appointed his wife *Rebecca* his executrix, to whom letters testamentary were duly granted on the 25th of March 1797, copies of which will, dated the 13th of March 1786, and the letters testamentary, were offered in evidence. The plaintiff then produced to the court *William Cooke*, esquire, as a witness, and upon examining him, he proved to the court, that shortly after the granting of letters testamentary to *Rebecca Dulany*, he received a power of attorney from her, authorising him to act for her in all things relating to the said estate, as well in collecting the debts due to the testator, as in making sale of the real and personal estate belonging thereto; and that he received the power of attorney while he resided at *Annapolis;* that on his removal to *Baltimore* he supposed it might have been mislaid; for that having occasion to refer to it not long since, he had looked among his papers but could not find it; that he did not make very strict search for it, and believes that it is among his papers, because all his papers are kept under lock and key, and few persons have access to them except himself. The Court, (*Nicholson*, Ch. J.) determined, that unless the original power of attorney was produced, or proved to be lost, or that the plaintiff had issued a *subpena* to the witness, with a *duces tecum*, the plaintiff could not give any evidence whatever of the power of attorney to the jury. The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued before CHASE, Ch. J. BUCHANAN, GANTT, and EARLE, J. by

*Harper,* for the Appellant; and by
*Boyd,* for the Appellee.

THE COURT agreed with the court below in the opinions expressed in both of the bills of exceptions.

JUDGMENT AFFIRMED.

---

TURNER vs. BOUCHELL's Ex'rs. and JESTER.

JUNE.

APPEAL from a decree of the Court of Chancery, *dismissing* the bill of complaint. The bill filed on the 7th of March 1797, by *John Turner,* and *Rachel* his wife, stated that *John Vansant,* father of *Rachel,* the female complainant, being seized and possessed of sundry tracts of land in fee simple, and possessed of the interest and term of years unexpired and then to come, of two leases for 80 years, of two *Grist Mills,* one lease dated the 21st of March 1744, and the other the 26th of April 1764, and having divers debts due to him on bonds, &c. amounting to £1654 13 0 current money, and being indebted to *Owen Jones,* and others, in the sum of £4681 1 8 current money, on bonds, he did, on the 1st and 3d of September 1766, execute to the said *Jones,* and others, a mortgage deed for all the said real property, except the parcels of leased lands, in order to secure to them, and the other creditors, the payment of the debts so due to them respectively; and he did at the same time assign the debts so due to him, and mortgage the said leasehold property to the said *Jones,* and others, for securing the debts so due from him, and did empower them to collect the said debts, and apply the same towards the discharge of the debts so due from him. [By these mortgages *Vansant* was to remain in possession of the lands, &c. and take the profits, &c. for five years, if he performed the covenant therein mentioned, by paying annually a certain part of the debt; and at the end of five years, or upon failure to pay, &c. (the debt or any part being unpaid,) *Jones* and others were to sell all the lands, &c. and apply the proceeds to

On a bill in chancery by R, the representative of J, deceased, to obtain the account of J, an executor of his administration of the personal estate, and payment of the balance due from him; also to obtain from B a conveyance of certain tracts of land, which had been mortgaged or conveyed in trust, &c in 1766 by J, to certain of his creditors, and by them conveyed to B, on receiving the balance of the mortgage debt;—Held, that the deeds of 1766, from J to his creditors, are to be considered as mortgages or deeds of trust made to secure the payment of money due to certain creditors of J; that the redeemable quality incident to mortgages, or the resulting use, was not extinguished or destroyed by the power vested in the deeds to sell the lands.

That B being the executor of J, and having compounded the debts due on the mortgages or deeds of the trust, with the creditors of J, for a sum much below the value of the lands, should not take any benefit of the composition to himself; but any advantage resulting therefrom should devolve on the other creditors of the testator, and the right of the surplus, if any should remain after payment of the debts, should vest in his representative, upon the principle that he who accepts a trust takes it for the advantage of the persons for whom he is trusted, and not for his own.

The court of appeals having reversed the decree of the court of chancery, made a statement of the account between the parties, and decreed accordingly, and also decreed that the chancellor make and pass all necessary orders for carrying their decree into effect.